Receipt number AUSFCC-10163647

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| MIDNIGHT SUN – CENTENNIAL JV, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. _____ |
| v. | ) | 25-146 C |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

COMES NOW Plaintiff, Midnight Sun – Centennial JV, LLC ("MSC"), by counsel, and for its Complaint against The United States of America, acting by and through the United States Army Corps of Engineers, states as follows:

### JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491.  MSC brings this action pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 601, *et seq.*

### PARTIES

2.      Plaintiff, MSC, is an Alaska corporation with a principal place of business located in the State of Alaska.  MSC is in the construction contracting business and is duly authorized to transact business within the State of Alaska and is a qualified federal government contractor.

3.      Defendant is the United States of America acting through the United States Army Corps of Engineers ("USACE" or the "Government").

# FACTS

## The SATOC

4.       The Government offered an Indefinite Delivery, Indefinite Quantity Single Award Task Order Contract No. W912PM21D0003 (the "SATOC") for construction work at Military Ocean Terminal Sunny Point ("MOTSU") located in North Carolina as a Competitive 8(a) Set Aside opportunity, and MSC – as a Small Business Administration ("SBA") recognized small business joint venture – submitted its proposal for the SATOC.

5.       As part of its proposal, MSC bid a set of coefficients that MSC and the Government would use to determine the price of individual Task Orders under the SATOC.[1]

6.       On or about March 3, 2021, the Government awarded MSC the SATOC incorporating MSC's coefficients therein.

7.       The Design Submittal Specifications within the SATOC set forth, among other things, the process through which the price and scope for each delivery order would be developed by MSC and representatives of the Government. These specifications repeatedly require that task orders be priced using RS Means Cost Data after the development of a scope of work. RS Means Cost Data is a cost database of thousands of construction elements that could be performed under the SATOC. Each element is listed as a line item, with an accompanying description and unit price. These line items are numbered and organized into divisions defined by the Construction Specifications Institute ("CSI"); thus, the line items selected from the RS Means Cost Data are sometimes referred to as a CSI list.

8.       For example, SATOC Specification 3.1.1, titled "Delivery Order Pricing for Cost Works," states that "[t]he most current version of R.S. Means Cost Works will be utilized in cost

---

[1] The SATOC uses the terms "Task Order" and "Delivery Order" interchangeably to refer to the definitized award of a construction project to MSC.

estimate production." Specification 3.1.1 further provides that "[t]he delivery order firm fixed-price shall be arrived at by adding all of the RS MEANS line items and multiplying that total by appropriate coefficient."

9.    SATOC Specification 3.2.1, titled "RS Means Pricing for Cost Works," similarly instructed MSC to "[u]tilize RS Means line-item cost from the 'Total with Overhead and Profit' column. This method is required unless requested and approved by the Contracting Officer prior to submission of proposal." By identifying the line item and column ("Total with Overhead and Profit"), MSC and the Government determine the unit price for an individual component of construction. Multiplying these unit prices by the quantities of each component and the applicable coefficient determines the total price for the delivery order.

10.    In addition to describing the delivery order pricing process, the SATOC also described the process for developing scopes of work. SATOC Specification 3.3 describes the "SATOC Delivery Order Proposal Preparation" process. In Section 3.3.1, titled "Delivery Orders", the process is described as follows:

> Delivery Orders shall be initiated with a Request for Proposal (RFP) signed by the Contracting Officer, which includes the Government's Statement of Work (SOW). Following issuance of the RFP, the Government will schedule a new delivery order meeting. The initial meeting shall be attended by Contractor personnel with sufficient experience to permit a meaningful meeting. At the meeting, the designated Government representative(s) identified in the Request for Proposal (RFP) shall review the Scope of Work (SOW) with the contractor. The SOW may consist of anything from a list of project performance objectives to a set of 100% construction drawings. At the conclusion of the initial meeting the contractor and the Government shall agree on the schedule for the next step in the project development process. The contractor shall perform a pre-proposal field survey to ascertain the conditions present at the construction site that may impact the scope, schedule, or budget. This site visit shall be documented by the contractor and presented to the Government for review and approval with the contractor's proposal and prior to issuing any delivery order. It shall describe any assumptions that the contractor used in developing their proposal. A CSI discussion meeting will occur after the site visit. The CSI discussion meeting is typically 2-3 weeks after the site visit and will be specified in the RFP or by the

contracting officer. The purpose of the CSI discussion meeting is to agree upon a list of line items without quantities. **The agreed upon CSI list without quantities will be used to build the final proposal.** Costs for all pre-delivery order work, site visits, and proposal shall be included within the contractor's coefficients.

(emphasis added).

11.    This process required the establishment and agreement on the line items and unit prices to be used in the proposal at the CSI discussion meeting. Those line items on the CSI list were to be used "to build the final proposal." The intent of this clause was to create a list of line items which would function as the scope of the work early in the process. Thereafter, MSC and the Government were then to negotiate and iterate only on the quantities as the project's delivery order moved through further review, negotiation, and acceptance.

The Pre-Engineered Metal Building RFP

12.    On June 17, 2021, the Government issued a Request for Proposal under the SATOC for the design and construction of a pre-engineered metal building ("PEMB") to serve as an equipment shelter at MOTSU (the "RFP").

13.    The RFP's Scope of Work required that "Cost Estimating for this Task Order shall be performed using CostWorks/RS Means Online software." The RFP also required MSC to provide a "preliminary list of R.S. Means Cost Works CS [sic] line items (without quantities or prices) . . . no later than 9 July 2021." These CSI line items constituted the scope of work for the PEMB Project and provided the unit prices to be used by MSC and the Government to develop the ultimate delivery order.

14.    On July 9, 2021, the Government issued Amendment 1 to the RFP. Among the changes in this Addendum, the Government gave MSC until July 16, 2021, to provide a "preliminary list of R.S. Means Cost Works CS [sic] line items (without quantities or prices)."

15.     On July 14, 2021, the Government issued Amendment 2 to the RFP.

16.     On July 16, 2021, MSC submitted a preliminary list of line-item pricing using the R.S. Means Cost Works. This list formed the basis of discussion to establish the CSI list used by MSC to develop its initial, revised, and final proposals as required by Section 3.3.1 of the SATOC.

17.     On July 30, 2021, the Government issued Amendment 3 to the RFP.

18.     Two weeks later, on July 30, 2021, MSC submitted its initial proposal for $1,762,093.50. This pricing was developed using only RS Means line-item prices, quantities, and the applicable coefficient. As explained below, MSC subsequently issued revisions to its initial proposal based on ongoing discussions and negotiations between MSC and the Government.

19.     On August 13, 2021, MSC submitted its first revised proposal in response to the RFP in the amount of $1,624,874.96. This revised proposal was still based on a minimum of 90% RS Means pre-priced cost line items and reflected changes arising from ongoing negotiations between the Government and MSC.

20.     On August 26, 2021, the Government issued Amendment 4 to the RFP, which attached an updated Scope of Work and stated that the significant changes made therein were limited to the concrete apron. This Scope of Work therein again required that "Cost Estimating for this Task Order shall be performed using CostWorks/RS Means Online software."

21.     On August 31, 2021, MSC submitted its second revised proposal in the amount of $1,416,838.67.

22.     On September 1, 2021, MSC submitted its third revised proposal in the amount of $1,416,855.06.

23.    On September 8, 2021, MSC submitted its fourth revised proposal in the amount of $1,416,836.63.

24.    On September 13, 2021, the Government issued Amendment 5 to the RFP, which was expressly limited to providing updated wage determinations to be used in the project.

25.    On September 15, 2021, MSC submitted its fifth and final revised proposal again in the amount of $1,416,836.63.

The SATOC Modification

26.    In the summer of 2021, the impacts of the worldwide COVID-19 pandemic were still being experienced. These impacts included introducing volatility into the cost of construction, including the component and material inputs into construction. This volatility led to unusual inflation in the price of construction and construction materials.

27.    After the parties had commenced the task order negotiations in response to the RFP described above and required by the SATOC Specifications, on August 11, 2021, the Government issued Modification P0001 to the SATOC.

28.    In Modification P0001, the Government expressly stated that the purpose of the modification was to address "the current atypical relationship between RS Means and the current market fluctuations." Specifically, the Government, only amended Section 3.2.1.1 of the SATOC by stating: "Section 3.2.1.1 Alternate Price Method (Pre-Priced) is changed for proposals submitted dated on or after August 15, 2021 through March 31, 2022:

> Replace, "A minimum of 90% of the total construction proposal cost must be calculated using RS Means pre-priced cost line items." with "A minimum of 30% of the total construction proposal cost must be calculated using RS Means pre-priced cost line items."

29.    Modification P0001 did *not* modify other sections of the SATOC that required the use of RS Means pricing, including SATOC Specifications 3.1.1, 3.2.1, and 3.3.1.

30.    Because MSC already entered into negotiations with the Government for the work called for in the RFP and required by the SATOC Specifications, and because Modification P0001 did not change other clauses of the SATOC that dictated how proposals were to be developed, MSC did not believe that a departure from the requirement to use a minimum of 90% of the RS Means pre-priced cost line items identified and agreed to by MSC and the Government was appropriate and required by the Government.

31.    Amendments 3, 4, and 5 to the RFP failed to notify MSC that it could alter the pricing of its previously submitted proposals to be in line with the modified pricing methodology set forth in Modification P0001 to the SATOC.

32.    Modification P0001 did not change the SATOC clauses that prescribed the process for how a proposal was to be developed, and throughout the proposal negotiation and review process, the Government never provided MSC the option of expanding the scope of Modification P0001 to allow the entire proposal methodology to change from being primarily RS Means based.

The PEMB Contract

33.    On September 29, 2021, the Government awarded Delivery Order Contract W912PM21F0061 (the "Contract") to MSC in the amount of $1,416,836.63.

34.    The Contract incorporated by full text FAR 52.211-10, which states, in relevant part: "[t]he Contractor shall be required to … commence work under this contract within 10 calendar days after the date the Contractor receives the notice to proceed …." (emphasis in original).

35.    The Government later issued the Notice to Proceed to MSC on November 1, 2021. Pursuant to the terms of the SATOC and the Contract, MSC commenced and managed its

design work. Simultaneous with this effort, MSC solicited subcontractor pricing for the Project and discovered significant cost increases above the RS Means pricing.

36.     When MSC recognized that the market construction cost for the Project far exceeded the budget, it engaged with the design team on January 27, 2022, to conduct a secondary design review meeting to ensure there was no design scope creep or other potential errors in the design and design review process that led to cost for the work to be higher than planned.

37.     After that review was completed on January 31, 2022, MSC and its designer confirmed that the design only included the scope requirements and that there was no design scope creep or other potential errors. Accordingly, MSC submitted its design package on February 2, 2022.

38.     On February 9, 2022, MSC paused the formal final design review. At that time, MSC did two things: First, it notified the Government there was an apparent issue with the Project to provide additional context as to why MSC paused the design review. Second, MSC took the additional step of conducting an internal value engineering session with its design partner to identify potential areas that could decrease the Project's construction costs.

39.     The value engineering sessions with the design team were initiated on February 18, 2022, and concluded on March 11, 2022, with MSC receiving a revised final design of the Project. MSC then resolicited pricing from the subcontractor and vendor community to finalize construction pricing for the Project.

40.     While the value engineering exercise decreased the cost of construction, the outcome still left a significant gap between the RS Means based contract price and the actual

atypical market cost to construct the Project. As a result, the Project was no longer constructible under the then-used pricing methodology.

MSC's REA

     41.     On March 25, 2022, MSC submitted a Request for Equitable Adjustment (the "REA") to the Government requesting that Government issue a change order to increase the amount of the Contract by $851,925.71 to compensate MSC for the volatility and increases in the market for construction and acknowledged by the Government in Modification P0001.

     42.     The REA explained that commodity price and market fluctuations, inflation, supply chain issues, labor shortages, and other economic factors had caused a significant increase in the cost to complete the Project, such that deriving the order amount from RS Means data, as was done in this case, was not a viable approach for the Project.  In particular, these economic conditions affected the costs of steel, aluminum, transportation, and fuel—all of which MSC used to construct the Project.

     43.     The REA included a revised proposal developed by MSC that was based on the minimum of 30% RS Means data for the construction portion of the Project with the remainder being non-pre priced based pricing for the construction cost. This adjusted pricing methodology brought the Project contract amount in line with the then-current market conditions.

     44.     MSC's revised proposal calculated the actual task order price for the Project should be $2,268,762.34. The difference in value between the current Contract amount of $1,416,836.63 and the adjusted proposal amount of $2,268,762.34 was $851,925.71. Therefore, MSC requested that the Government issue a change order to increase the amount of the Contract by $851,925.71.

45.     On June 3, 2022, the Government rejected the REA. The Government did not dispute MSC's quantification of the REA. Rather, the Government (1) asserted that MSC did not specifically state the authority upon which the REA was based; (2) while referencing Modification P0001, asserted that MSC "chose not to incorporate the base IDIQ revision into any of its revised proposals … [and MSC] had the responsibility to review the pricing methodology as it related to the latest modification against the base IDIQ contract and to incorporate those changes into their proposal for the subject task order prior to the conclusion of negotiations and the final award;" and (3) stated that MSC "submitted five (5) proposal revisions between August 13, 2021 (after [MSC] had received the modification to the base contract) and September 15, 2021, with no mention of the modification's pricing impacts."

46.     In that response, the Government acknowledged that Modification P0001 was intended to provide MSC the opportunity to depart from RS Means pricing when calculating its proposal price even though Modification P0001 did not reference Specifications 3.1.1, 3.2.1, and 3.3.1. This was the first time that the Government ever notified MSC that it could have departed from the required RS Means pricing.

47.     On October 16, 2023, MSC submitted correspondence to the Government following up on the REA and the Government's rejection. MSC pointed out that, because the Government's position was that MSC was entitled to alter its proposal pricing methodology and MSC did not do so, then there existed an obvious mistake so apparent as to have charged the Government with notice of such mistake. If granted, MSC's REA would align MSC's task order price with what the task order price would have been had it been negotiated under the provisions in effect at that time for the SATOC and inclusive of the pricing provisions in Modification P0001 back in the August/September 2021 timeframe.

48.     As a result of this known mistake by the Government, MSC then argued:

The Government's position entitles MSC to relief under FAR 15.508 and FAR 14.407-4. FAR 15.508, titled "Discovery of mistakes," states that "[m]istakes in a contractor's proposal that are disclosed after award shall be processed substantially in accordance with the procedures for mistakes in bids at 14.407-4." FAR 14.407- 4, in turn, provides in relevant part that a contract may be reformed to increase the contract price if there exists a mistake "unilaterally made by the contractor, so apparent as to have charged the contracting officer with notice of the probability of the mistake."

49.     MSC also requested the Government to investigate this mistake, as required by FAR 14.407-4.

50.     On April 26, 2024, more than six months after MSC submitted its follow up to the REA, the Government made the following determination in subsequent correspondence relating to the REA:

The evidence does not warrant a determination under subparagraph (b)(1) or (2) of FAR 14-407-4 Mistakes After Award that there was a mistake in MS-C JV's proposal submitted for Construct Equipment Shelter for Military Ocean Terminal in Sunny Point, NC. MS-C JV was aware of the modification to the base IDIQ contract issued August 11, 2021; they acknowledged the change August 12, 2021. There was no challenge to the plain language of the modification indicating that the effect of the modification was understood at the first reading, ergo there was no basis for the Government to presume a mistake in the proposal. The Government therefore had no duty or reason to question MS-C JV's proposals in any of the four (4) proposal revisions submitted between Aug 26, 2021, and September 15, 2021, which were received after W912PM21D003 P00001 was acknowledge[d] on August 13, 2021.

MSC's Certified Claim

51.     On June 18, 2024, pursuant to FAR 33.2 (Disputes and Appeals), MSC submitted a certified claim ("Certified Claim") on the same basis as the REA described above and sought $851,925.71 for the pricing issue described above and in the REA.

52.     In the Certified Claim, MSC demonstrated that the Government has the authority and obligation to grant a cost adjustment to MSC.

53.     MSC also noted that, in its response to the REA, the Government admitted that Modification P0001 to the SATOC was intended to provide MSC the opportunity to depart from RS Means pricing when calculating its proposal price, but MSC did not take that opportunity.

54.     In the Certified Claim, MSC also demonstrated that the Government's refusal to grant a cost adjustment violated the implied covenant of good faith and fair dealing.

55.     On July 15, 2024, the Government sent MSC a "Notice of Delayed Contracting Officer's Final Decision (COFD)." In this Notice, the Government informed MSC that "the anticipated date [for the Government] to issue the COFD is October 31, 2024."

56.     On October 30, 2024, the Government sent MSC an additional "Notice of Delayed Contracting Officer's Final Decision (COFD)." In this Notice, the Government informed MSC that "the anticipated date [for the Government] to issue the COFD is November 29, 2024."

57.     On November 26, 2024, the Government sent MSC an additional "Notice of Delayed Contracting Officer's Final Decision (COFD)." In this Notice, the Government informed MSC that "the anticipated date [for the Government] to issue the COFD is **December 15, 2024**." (emphasis in the original).

58.     On December 2, 2024, the Government issued a Contracting Officer's Final Decision, denying MSC's Certified Claim in its entirety.

59.     The Contracting Officer's Final Decision denying MSC's Certified Claim was unreasonable, an abuse of discretion, and/or not in accordance with the terms of the SATOC, the Contract, and/or the pertinent facts and law.

60.     MSC has satisfied all conditions precedent for bringing this action.

## COUNT I
### (Breach of Contract)

61.     MSC incorporates by reference the allegations contained in ¶¶ 1-60 above as if fully set forth herein.

62.     MSC and the Government entered into the SATOC, which constitutes a valid and enforceable contract between the parties.

63.     MSC and the Government entered into the Contract, which constitutes a valid and enforceable contract between the parties.

64.     MSC acted in good faith in submitting its original proposal, as well as in submitting all of its subsequent revised proposals. MSC acted in good faith in requesting an equitable adjustment upon discovery of the mistake in calculating pricing and in submitting its Certified Claim.

65.     To the best of its ability, MSC performed all of its contractual obligations under the SATOC and the Contract.

66.     MSC has performed all conditions precedent under the SATOC and the Contract.

67.     The Government materially and inexcusably breached the SATOC and the Contract by (1) failing to inform MSC that its proposals did not comport with the ability to submit pricing proposals based on a minimum of 30% RS Means data instead of 90% RS Means data; (2) refusing to acknowledge and properly investigate that mistake after its discovery; and (3) refusing to adjust the pricing structure and issue a change order to increase the amount of the Contract by $851,925.71.

68.     As a direct and foreseeable result of the Government's material breaches of the SATOC and the Contract, MSC is entitled to an equitable adjustment of $851,925.71 in order to complete the Project.

## <u>COUNT II</u>
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

69.     MSC incorporates herein by reference the allegations contained in ¶¶ 1-68 above as if fully set forth herein.

70.     Both the SATOC and the Contract contain an implied covenant of good faith and fair dealing, pursuant to which the Government has a duty to perform its obligations under the SATOC and the Contract in good faith and not to take actions detrimental to MSC's contractual rights. The foregoing actions or inactions by the Government establish that the Government materially breached that implied covenant of good faith and fair dealing under the SATOC and the Contract.

71.     Specifically, the Government breached the implied covenant of good faith and fair dealing by (1) failing to inform MSC that its proposals did not comport with the ability to submit pricing proposals based on a minimum of 30% RS Means data instead of 90% RS Means data; (2) refusing to acknowledge and properly investigate that mistake after its discovery; and (3) refusing to adjust the pricing structure and issue a change order to increase the amount of the Contract by $851,925.71.

72.     Additionally, the Government breached the implied covenant of good faith and fair dealing by repeatedly delaying its review of and issuance of decisions pertinent to MSC's REA and Certified Claim to the financial detriment of MSC, a small business joint venture.

73.     As a direct and proximate result of the Government's breach of the implied covenant of good faith and fair dealing, MSC has suffered and continues to suffer damages as alleged herein.

## COUNT III
### (Review of Contracting Officer's Denial of MSC's Certified Claim)

74.     MSC incorporates herein by reference the allegations contained in ¶¶ 1-73 above as if fully set forth herein.

75.     The Contracting Officer's Final Decision rejecting MSC's Certified Claim should be overruled, and judgment should be entered in MSC's favor on its Certified Claim, because the Contracting Officer's Final Decision was unreasonable, an abuse of discretion, and/or not in accordance with the terms of the SATOC and the Contract and the relevant law and facts.

76.     The Government materially and inexcusably breached the SATOC and the Contract by (1) failing to inform MSC that its proposals did not comport with the ability to submit pricing proposals based on a minimum of 30% RS Means data instead of 90% RS Means data; (2) refusing to acknowledge and properly investigate that mistake after its discovery; and (3) refusing to adjust the pricing structure and issue a change order to increase the amount of the Contract by $851,925.71.

77.     The foregoing actions or inactions by the Government also establish that the Government materially breached the implied covenant of good faith and fair dealing under the SATOC and the Contract.

78.     In accordance with the SATOC's terms and the Contract's terms, and as a matter of law, MSC is entitled to an equitable adjustment of at least $851,925.71.

WHEREFORE, MSC respectfully requests that judgment be entered in MSC's favor against the Government for breach of the SATOC and the Contract and for breach of the implied covenant of good faith and fair dealing; that this Court find that that the Contracting Officer's Final Decision rejecting MSC's Certified Claim be reversed so that judgment is entered in MSC's favor and against the Government for an amount of at least $851,925.71 plus interest,

15

legal fees and costs to the extent allowed by the SATOC and the Contract and/or law; and such further relief that this Court deems just and proper.

Dated: January 27, 2025                                Respectfully submitted,

                                                       Midnight Sun – Centennial JV, LLC

                                                       By Counsel:


                                                       /s/ Robert D. Windus
                                                       Robert D. Windus
                                                       MOORE & LEE, P.C.
                                                       1751 Pinnacle Drive, Suite 1100
                                                       McLean, Virginia  22102
                                                       Telephone: (703) 506-2050
                                                       Facsimile: (703) 506-2051
                                                       E-Mail:  r.windus@mooreandlee.com

                                                       Of Counsel:
                                                       David J. Todd
                                                       MOORE & LEE, P.C.
                                                       1751 Pinnacle Drive, Suite 1100
                                                       McLean, Virginia  22102
                                                       Telephone: (703) 506-2050
                                                       Facsimile: (703) 506-2051
                                                       E-Mail: d.todd@mooreandlee.com